IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Whites Landing Fisheries, Inc., | Case No. 3:20 CV 2740 |
| Plaintiff, | MEMORANDUM OPINION |
| -vs- | JUDGE JACK ZOUHARY |
| Eddie C. Towles, | |
| Defendant. | |

### INTRODUCTION

What began as a small-value claim over a Father's Day boating accident has turned into a protracted federal case, complete with a bench trial on liability and damages, and post-trial briefs (Doc. 21–23). The central figure? Not a tsunami. Not a tempest. But a thunderstorm. Plaintiff Whites Landing Fisheries, Inc. ("Whites Landing") first sued Defendant Eddie Towles in municipal court, claiming Towles steered his boat into Whites Landing's fishing nets during an afternoon thunderstorm on Lake Erie (Doc. 1-1). Towles counterclaimed, alleging Whites Landing misplaced its nets and was therefore responsible for damage to Towles' boat (Doc. 1-2). Towles removed the case to this Court pursuant to its federal maritime jurisdiction. 28 USC §1333(1). Each side seeks compensatory damages, punitive damages, and attorney fees.

### BACKGROUND

In the mid-afternoon on June 21, 2020, Towles cast off from a marina in the Huron River on his 34-foot twin-motor leisure boat (the "Floored"), joined by his wife and two children, and another couple with their two children (Doc. 21 at 57–101). Their intended destination: a shallow area of Lake Erie near a beach for swimming (*id.* at 61, 82). Before heading out, Towles checked local weather reports, which predicted a mostly sunny day with possible isolated thunderstorms in the

afternoon (Doc. 21 at 62). As he navigated out into the lake, Towles became aware of a storm approaching from the south (*id.* at 65).

Rather than pause or turn back, Towles decided to proceed further into the lake (*id.*). Approximately fifteen minutes later, as the storm appeared to worsen and the sky became "very dark," Towles navigated westbound toward Cedar Point, the direction of the intended destination (*id.* at 66). The storm quickly became "severe" and moved directly overhead (*id.* at 67). Despite the conditions -- four-to-six-foot waves, high winds, and visibility described as "very, very poor," akin to "when you're driving and it's raining so hard that you're having a hard time seeing through your windshield wipers," Towles chose to turn the boat around and slowly navigate eastward back towards the marina, directly through the storm (*id.* at 66–68, 72, 92).

While pushing through the storm, the boat suddenly made a loud noise and lost power in its right motor (*id.* at 68). Having clearly struck something, Towles turned off the other motor and investigated further, eventually discovering that the boat had become tangled in a black rope (*id.* at 69–70). Towles immediately alerted the Coast Guard over the radio, reporting they were "dead in the water," but did not request assistance (*id.* at 71). Towles and the other three adults were all on the top deck, and allegedly alert to the conditions around them, "as much as you could be in poor visibility" (*id.* at 69).

Prior to the accident, Towles did not see any markings or flags, which are required to alert boaters to the location of fishing nets (*id.*). Towles felt it was unsafe to leave the boat anchored in an awkward fashion given the weather conditions and decided to cut the rope entangling the propeller -- accomplishing this by leaning over the swim platform at the back of the boat, with his friend holding his feet while the waves crashed over him (*id.* at 70). Successfully cutting the rope, Towles then, with only one motor, steered to a marina in Point Pleasant (*id.* at 70–72). The following day, Towles spoke with Ohio Department of Natural Resources ("ODNR") Watercraft Officer Sergeant Walter

Hodgekiss, who wrote an investigation report of the accident (Docs. 21 at 73). In that report he cited "operator inexperience" as the primary cause of the accident, along with "weather" as a factor (Trial Ex. 3)

### DISCUSSION

**Liability**

Whites Landing alleges Towles is liable under either a simple negligence theory, based on the negligent operation of his boat, or a negligence *per se* theory, due to his failure to comply with ODNR regulations by striking a properly flagged commercial fishing net (Doc. 1-1). Towles denies both claims and, in his Counterclaim, alleges that Whites Landing's improper placement of its nets raises a presumption of liability under the Pennsylvania Rule, which this Court analyzes below. In the alternative, Towles offers an affirmative defense -- that the accident was caused by an Act of God and that his actions should be excused as "an error in extremis" (*id.*).

*Pennsylvania Rule*

The nearly 150-year-old Pennsylvania Rule is triggered when a party violates a statute or regulation intended to prevent maritime accidents. *The Pennsylvania*, 86 U.S. 125, 136 (1873). The Rule requires the party in violation of the statute or regulation to prove that the violation *could not* have been a cause of the accident. *Id*. The Rule does not fix liability, rather it allocates a burden of proof to the violating party. *Pennzoil Producing Co. v. Offshore Exp., Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991). The Rule originally applied only to collisions between ships, but courts have since expanded the Rule to all maritime accidents. *Id*.

Relevant here are the regulations pertaining to the proper placement and flagging of commercial fishing nets. ODNR regulations require permitted fishing nets in Lake Erie be marked with anchored flags -- a double flag on the outer side (for Lake Erie, the north side), and a single flag on the inner, shoreside end of the netting (Doc. 23-1 at 10). Specifically, the shoreside flag must

3

have an 18-inch square red flag mounted on a 6-foot staff, and the outside double flag must be marked with two 18-inch square flags on an 8-foot staff (*id.* at 10–11). An Ohio statute also requires: "No person shall leave a commercial fishing device in a slack manner, or torn parts thereof, in the waters of the Lake Erie fishing district . . . ." Ohio Rev. Code § 1533.55.

Dean Koch, President of Whites Landing, testified that his crew complies with these requirements, and that the nets at issue here were marked with a single red flag with an over 18-inch pendant on the shore side and two black flags on the outside, each eight feet above the water (Doc. 21 at 13). The flags are placed on 16-to-20-foot aluminum staffs, attached to floats with weights to prevent them from drifting (*id.* at 30). Whites Landing crew members place these flags alongside the trap nets each time the nets are placed in the lake, as part of the routine course of business (*id.*).

When asked if he had seen any double flags prior to the collision, Towles testified at trial that he "did not see anything the day of the incident prior to the boat [hitting the net]" (Doc. 21 at 69). This contradicts what he told Sergeant Hodgekiss the day after the accident, when he stated that he believed he was north of the double flag at the time of the collision, with Hodgekiss suggesting, "[h]e had to see a double flag if he thought he was north of it" (Doc. 23-1 at 14). Whether or not he saw the flags prior to striking the net, Towles admits he was able to "clearly" see the double flag shortly after the accident (Doc. 21 at 74). Towles testified that after he cut his boat free, he "travel[ed] north away from the entanglement" and "clearly observed that we were north of the double flag," where he also observed floatation buoys and a portion of the net floating on the surface (Doc. 21 at 75).

Sergeant Hodgekiss testified that, in his experience, nets can be brought to the surface of the water following accidents with boat propellers (Doc. 23-1 at 15). According to Matthew Liebengood, a law-enforcement supervisor for the ODNR's Division of Wildlife, there were no reported accidents in 2020 involving nets unlawfully set by Whites Landing (Doc. 23-2 at 7). Based upon the record facts, the most probable scenario is that the Whites Landing nets were properly flagged and anchored.

4

Netting observed north of the double flags after the accident would likely have been the result of Towles' cutting the rope, allowing the net to drift from its anchor. Moreover, a properly-attentive boat operator would likely have been able to see the flagging, as it complied with all the requisite ODNR and ORC requirements. This Court notes that the three other adults, allegedly serving as lookouts, did not testify at trial. Towles' version of events remains unsupported. With poor visibility, it was incumbent on Towles to exercise necessary care and, if an attentive lookout was inadequate, particularly at the low speeds the boat was allegedly moving (five to eight miles per hour according to Towles), a prudent boater would have ceased operating the boat until conditions improved (Doc. 21 at 67).

This conclusion is buoyed by the testimony of Sergeant Hodgekiss, who stated that although Towles wasn't officially cited for failure to maintain a proper lookout, "[h]e did hit a fish net. So he didn't have a proper lookout by all available means [. . .] if visibility's that bad, then maybe you shouldn't be operating your boat" (Doc. 23-1 at 9–10). This Court agrees. *See Skandia Ins. Co. v. Star Shipping AS*, 173 F. Supp. 2d 1228, 1240–43 (S.D. Ala.), *aff'd sub nom. Skandia Ins. Co. v. Star Shipping Co.*, 31 F. App'x 201 (11th Cir. 2001) (holding, in an admiralty law case, "an 'Act of God' will insulate a defendant from liability *only* if there is *no* contributing human negligence [. . .] even in the face of a hurricane befitting the 'Act of God' category, [d]efendants still bear the burden of establishing their lack of fault, to be properly exonerated from liability . . .") (emphasis in original). Regardless of whether there was a proper lookout, Towles negligently navigated his boat into the storm. Conditions were too severe to be out on the lake. There was no evidence presented of other boaters out on the water, let alone any in trouble, that afternoon. It was Towles' decisions, not an Act of God, that resulted in the accident at issue here.

**Actual Damages**

The parties contest the amount of actual damages incurred by Whites Landing. The ODNR property damage estimate, based on documentation submitted by Whites Landing, was $4,600 (Doc. 23-1 at 13). Whites Landing also suffered a loss of revenue for the days the net was out of the water for repairs -- increasing the total to $5,500 (*id.*). A subsequent estimate by Whites Landing, included in an August 2020 demand letter sent to Towles, totaled $6,500 (Doc. 21 at 60). After being prompted to provide a more detailed account of the costs incurred, the final estimate provided by Whites Landing totaled $7,570.50 (Trial Ex. 1). (Note: It appears the total in Ex. 1 was incorrectly tabulated at $8,323.50).

Koch testified this final estimate provides the most accurate account of the loss (Doc. 21 at 17). Koch stated the actual costs relating to fixing the damage included: removing the net, dismantling the net, cutting materials, rebuilding the net, painting the net, brining the net, and re-setting the net in the water (*id.*). In addition, Koch claimed lost income due to the repair time for the net, which he supported with data from 2020 catch reports (Ex. 1).

Koch itemized the losses as follows, based on a pay rate of $90/hour for his staff:

| Description | Cost |
|---|---|
| 8 hours dismantling and cutting the webbing; taking netting apart | $720 |
| Use of boat to retrieve net | $640 |
| 8 hours cutting material, ropes, and buoys for patching | $720 |
| 8 hours rebuilding, splicing, and replacing buoys | $720 |
| 8 hours finishing, repairing, treating, painting, and spreading the net | $720 |
| 8 hours obtaining, preparing, and drying materials | $720 |
| 8 hours resetting the net | $720 |
| Use of boat to reset net | $640 |
| Fuel cost for lifting/retrieving net (90 gallons at $2/gallon) | $180 |
| 25 gallons of paint (55-gallon drum costing $1,200) | $545 |
| 25 pounds of replacement webbing (100-pound bale costing $1,200) | $300 |
| 100 feet of replacement rope (600-foot coil costing $200) | $33 |
| 10 replacement floats (at $2 per float) | $20 |
| Fish loss for seven days, based on 2020 averages | $892.50 |
| TOTAL | $7,570.50 |

The fact that actual damages exceeded an initial estimate is not, alone, surprising. An estimate is just that -- an estimate. Koch's testimony at trial credibly supported the documented costs incurred by Whites Landing, detailing the purpose and reason behind the cited repair costs (Doc. 21 at 15–18, 24–27, 31–56). Towles is liable for damages in the corrected amount.

**Attorney Fees**

Whites Landing also requests attorney fees, totaling $13,500. Towles correctly points out that attorney fees are not awarded in maritime cases as a matter of course. Rather, it must be shown either "(1) they are provided by the statute governing the claim, (2) the non-prevailing party acted in bad faith in the course of the litigation, or (3) there is a contract providing for the indemnification of attorneys' fees." *Natco Ltd. P'ship v. Moran Towing of Florida, Inc.*, 267 F.3d 1190, 1193 (11th Cir. 2001) (citing *Noritake Co. v. Hellenic Champion*, 627 F.2d 724, 730–31 n.5 (5th Cir. 1980)).

Whites Landing alleges Towles acted in bad faith -- the second ground. To show bad faith, a party must offer clear evidence that its adversary, ". . . commenced or conducted an action in bad faith, vexatiously, wantonly or for oppressive reasons." *Dow Chemical Pac. Ltd. v. Rascator Mar. S.A.*, 782 F.2d 329, 344 (2d Cir. 1986) (citing *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.*, 417 U.S. 116, 129 (1974)). Whites Landing points to Towles' decision to remove a relatively small-value case to federal court, rather than allow it to proceed in municipal court, as evidence of bad faith "forum shopping" intended to intimidate Whites Landing (Doc. 22 at 11). Whites Landing also alleges Towles failed to report the accident to the ODNR or his insurance carrier, and avoided Plaintiff's communications pre-suit, which needlessly and unnecessarily escalated the matter and increased costs (*id.*).

First, however imprudent it was to avoid early resolution, draw out the litigation, and remove a relatively low-value case to federal court, such conduct does not satisfy the bad faith requirement. This Court cannot find bad faith where a defendant lawfully utilized a federal hook to catch a federal

7

venue. *See Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005) (noting that a party must lack "an objectively reasonable basis for seeking removal" to justify an award of attorney fees); *see also Warthman v. Genoa Twp. Bd. of Trs.*, 549 F.3d 1055, 1059–60 (6th Cir. 2008) (holding "an award of costs, including attorney fees, is inappropriate where the defendant's attempt to remove the action was fairly supportable, or where there has not been at least some finding of fault with the defendant's decision to remove") (internal quotations omitted). Further, as noted above, Towles immediately reported the accident to the Coast Guard, speaking to them four times via radio and cell phone (Doc. 21 at 58). He also complied with the subsequent ODNR investigation the day after the accident, speaking with Sergeant Hodgekiss, and ultimately did file a claim with his insurance company (*id.* at 59, 73). If there was any delay in reporting the accident to his insurer, it certainly does not rise to the level of being vexatious or in bad faith.

Throughout this litigation, this Court has not observed behavior by either party that would rise to the level of bad faith. Because of this, neither party is entitled to recover attorney fees.

**Punitive Damages**

Whites Landing also requests an award of punitive damages, based on Towles' failure to heed storm warnings, post a lookout, heed the properly placed markings, and to promptly report the accident to the authorities (Doc. 22 at 2). To obtain punitive damages in a maritime action, the non-moving party must commit "gross negligence, actual malice or criminal indifference." *Matter of Mardoc Asbestos Case Clusters 1, 2, 5 & 6*, 768 F. Supp. 595, 598 (E.D. Mich. 1991) (quoting *Complaint of Cambria Steamship Co.*, 505 F.2d 517, 523 n.11 (6th Cir. 1974).

However, as noted above, none of the actions Towles is alleged to have taken go beyond mere negligence. Towles promptly reported the accident to authorities (Doc. 21 at 58). The ODNR investigation into the issue did not result in any citation being issued for failure to post a lookout (Doc. 23-1 at 9). Although weather reports indicated a chance for pop-up thunderstorms, such a

forecast is not uncommon for Lake Erie in the summer (*id.*).  Rather, it was Towles negligence that incurred the damages at issue in this case.

Towles' testimony remains unconvincing, meaning his Counterclaim for $50,000 in punitive damages -- based on Whites Landing's alleged failure to inspect and maintain its nets -- fails.  Unfortunately, considering the attorney fees already expended by both parties, neither party may come out a "winner" as a result of this litigation.  Early settlement likely would have been a preferable outcome.

## Conclusion

Father's Day did not bring "fair winds and following seas" for Defendant Towles.  This Court finds in favor of Plaintiff Whites Landing, concluding that Defendant Eddie Towles is responsible for the damages incurred by Whites Landing -- totaling $7,570.50, plus interest accruing from September 29, 2020, the date of the initial Complaint.  *The Scotland*, 118 U.S. 507, 518–19 (1886) (holding in maritime cases, an award of prejudgment interest is within the discretion of the court).  *See also Monsanto Chem. Co. v. No. 3 Bull Towing Co.*, 326 F.2d 18, 26 (6th Cir. 1963) (same).  Interest shall accrue at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the filing of the case -- in this case, 0.12 percent.  Towles is not entitled to damages.  The requests for punitive damages and attorney fees, from both parties, are sunk.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
    JACK ZOUHARY
    U. S. DISTRICT JUDGE

December 28, 2021